FILED

DEC 18 2019

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

1      **FOR PUBLICATION**

2      UNITED STATES BANKRUPTCY COURT
       EASTERN DISTRICT OF CALIFORNIA
3

4      In re: ALISICA DAVIS-BROWN,            )
                                              )
5                           Debtor.           )  Case No. 17-21719-C-7
                                              )
6      _____       )
                                              )
       BMW BANK OF NORTH AMERICA              )
7                                             )  Adv. Pro. No. 17-02052
                            Plaintiff,        )
8      v.                                     )
                                              )
9      ALISICA DAVIS-BROWN,                   )
                                              )
10                          Defendant.        )
       _____       )

11                          **OPINION**

12          **Before: Christopher M. Klein, Bankruptcy Judge**

13

14     Timothy J. Silverman, Scheer Law Group, Newport Beach, CA, for
       BMW Bank of North America
15

16

17     CHRISTOPHER M. KLEIN, Bankruptcy Judge:

18          A bank's blind reliance on financial ratios does not qualify

19     as "reasonable reliance" on a false financial statement for

20     purposes of excepting a debt from discharge under 11 U.S.C.

21     § 523(a)(2)(B)(iii) when it has information inconsistent with the

22     credit application presented through an automobile dealer.

23          BMW Bank of North America wants a default judgment for

24     $46,041.96 to be entered and excepted from discharge.  But the

25     fact of default does not compel a court to enter judgment.

26     Federal Rule of Civil Procedure 55(b)(2), as incorporated by

27     Federal Rule of Bankruptcy Procedure 7055, requires a plaintiff

28     to establish facts sufficient to warrant the relief sought.

BMW Bank urges that it "reasonably relied" on a financial ratio in its lending algorithm despite red flags signaling bad information and urges that there is no relevance to what was known by the dealer who generated and presented the defendant's inaccurate financial statement based on customer input.

BMW Bank has three problems in this case.  First, BMW Bank has not carried its default judgment burden to establish reasonable reliance.  Nor has it carried its burden to establish proximate cause for its loss.  And, the BMW dealer's obvious manipulation in preparing and presenting the putatively false statement undermines proof of intent to deceive.

After extensive default judgment proceedings, including multiple hearings, live testimony, briefs, and more briefs, this court is not persuaded BMW Bank has carried its burden of proof.

BMW Bank, declining further opportunity to prove its case and preferring to appeal a dismissal, the default judgment motion will be DENIED and the adversary proceeding DISMISSED.

### Facts

On March 7, 2015, the debtor defendant traded in a model year 2013 BMW motor vehicle and purchased a used 2014 BMW from Weatherford BMW in Berkeley, California.

Payments on the 2013 BMW being traded in had been current throughout the 17 months the debtor had owned the vehicle.

The purchase price of the 2014 BMW was $35,079.65, to which was added the $6,509.94 deficiency occasioned by her trade-in of a 2013 BMW for $20,000.00 (on which she owed $26,509.94), plus

1  taxes and fees bringing the total financed amount to $46,263.71.[1]

2      The terms were 60 monthly payments of $645.29 at 2.9% annual

3  interest, followed by a $11,862.00 balloon payment needed to

4  squeeze the monthly payment into the debtor's ostensible ability

5  to pay.  In other words, BMW Bank knew from the outset, from the

6  fact that a balloon payment was necessary, that the debtor lacked

7  the income to pay the debt within 60 months.

8      BMW Bank nevertheless chose to take from Weatherford BMW an

9  assignment of the account "without recourse."

10     The credit application, apparently produced on the dealer's

11 computer with assistance by its sales and finance personnel, is

12 incomplete and internally contradictory in at least six respects,

13 all of which invited scrutiny about the debtor's ability to pay

14 the debt being undertaken.[2]

15

16 ───────────

   [1]The Motor Vehicle Retail Installment Contract is BMW
17 Exhibit 1.

18     [2]The incomplete Credit Application on the form designated as
   "(REV 2/09) CaE00016" (BMW Exhibit 3) has at least six
19 deficiencies:
       First, Section A (Information Regarding Applicant) is self-
20 contradictory.  The "Nearest Relative Not Living With Applicant"
   is given as her mother, at the same address as the debtor.
21     Second, Section C (Asset and Debt Information) is
   incomplete.  Her residence is designated as rented for $200 per
22 month but omits the identity and address of the landlord.
       Third, the credit accounts box is checked as "open" but left
23 blank is required information regarding "credit type," "company
   name," "address," "balance," "high," and "monthly payments."
24     Fourth, the spaces are blank for "present vehicle financed
   by/leased by," "account no.," "address," and "monthly payments."
25 The "Bank Reference" names a credit union but leaves blank the
   designation of "account no.," "branch address," and "balance."
26     Fifth, also blank is the insurance information "previous
   insurance company or agent," "where vehicle will be garaged,"
27 "policy number," and "losses in the past 5 years?"

28 Sixth, the required designation of the applicant's capacity

                              3

The application's section for "Asset and Debt Information," is not credible to the naked eye.[3]  No assets are listed.  No debts are listed.  No bank accounts are identified.  Monthly rent of only $200 was accepted without confirmation from the landlord.

The person agreeing to pay $46,263.71 for the 2014 BMW was a 54-year-old housing desk clerk with an annual salary of $26,400.[4]

Although she initialed the line regarding her gross income from employment, she did not initial the subsequent lines listing Social Security of $1,400 and total monthly income of $3,600.[5]

The credit application ends with a notation that it would be presented to four named financial institutions, of which plaintiff was listed first as "BMWFS-Dublin, Ohio."[6]

_____

(individual, community, or joint) is not checked.

[3]The "Asset and Debt Information" comprises more than one-third of the form with the instruction "List all debts" and "use a separate page if necessary," is nearly blank.  The sole item of financial information provided in Section C (Asset and Debt Information) is "Rent $200" without the required identification of landlord.  The two form lines for credit accounts are blank.  The two form lines for "Present vehicle financed by/leased by" are blank.  The required "Bank Reference" line names a credit union but omits the required identification of account, branch address, and balance.

[4]Credit application Section A indicates that the debtor was 54 years old and employed as a "desk clerk" for "2 yrs 10 mos" with "gross monthly income from employment" of $2,200, which figure she initialed.

[5]Section A, below the initialed line for employment income, has lines that are not initialed for: "amount of other monthly income and sources" in which appears "Social Sercutiy [sic} $1,400;" and (2) "total monthly income" of "$3,600."

[6]Although plaintiff's counsel asserted that the debtor signed the application under penalty of perjury, not so.  The Credit Application form does not require an attestation.  The debtor signed under the line that she "acknowledges receipt of a copy of this credit statement."  However, the lack of an

1    BMW Bank obtained a credit report before agreeing to finance
2    the transaction.  The credit report was inconsistent with her
3    statement of income and revealed she also was paying $434/month
4    for a Toyota vehicle and had other accounts in collection.[7]

5    BMW Bank's witness testified at the evidentiary hearing that
6    it relied solely on a debt-income ratio.  That ratio was
7    satisfied by income of $3,600/month, but not $2,200/month.  He
8    added that BMW Bank does not pay serious attention to the credit
9    report that it obtains to put in the file.  He asserted that this
10   approach is standard practice in the automobile finance industry.
11   The implications of the need for a balloon payment were not
12   considered.  He concluded that BMW Bank would have rejected the
13   financing if the monthly debt-income ratio was not satisfied −
14   i.e., if rent was higher than $200 or income less than $3,600.

15   After the trade-in, after two timely $645.29 payments were
16   made to BMW Bank, the 2014 BMW was declared a total loss
17   following an accident and payments ceased.[8]

18

19   _____

     attestation does not disqualify a credit application as a
20   "statement" for purposes of § 523(a)(2)(B)(iii).

21   [7]The Experian Credit Report was introduced in evidence
     during this court's evidentiary hearing as Hearing Exhibit 9.
22   That March 7, 2015, credit report confirmed her $26,400/year
     employment.  It indicated that she had two accounts in collection
23   and six open current accounts.  The six open current accounts
     called for monthly payments of $1,136.  The open current accounts
24   included one with Toyota Motor Credit for $24,465 with monthly
     payments of $434 that had been current for 11 months and one with
25   BMW Financial Services for the 2013 BMW being traded in with
     monthly payments of $560 that had been current for 17 months.
26   Exclusive of the payments for the BMW being traded in, the
     March 7 credit report revealed monthly payments of $576,
27   including the $434 for the Toyota.

28   [8]The Loan Payment History is BMW Exhibit 8.

Although BMW Bank says that the insurer denied coverage
because the vehicle was wrecked by an unauthorized driver, no
evidence is proffered to support that assertion.  No copy of
policy or of a clause permitting denial of coverage in favor of
the lienor for the value of the vehicle.  No communication from
insurer.  Nothing.  Nor does BMW Bank explain why, as lienor and
loss payee, it did not pursue the insurer.

Rather, BMW Bank seeks the full remaining $46,041.96 unpaid
contract amount from the debtor (including the $6,509.94
attributable to trade-in vehicle loan) on the theory that in the
trade-in of the 2013 BMW for a 2014 BMW after 17 timely payments,
the debtor was fraudulently acting as a straw buyer for her
"boyfriend" who wrecked it after making two monthly payments.[9]
That theory also implies that she had been a straw buyer in
acquiring the traded-in 2013 BMW.

Two years after the trade-in at issue in this adversary
proceeding, the debtor filed chapter 7 bankruptcy case No. 2017-
21719 on March 16, 2017, without counsel.

In the petition, schedules, and statements, the debtor
stated that she is married and living separately, employed as a
desk clerk at a housing facility in San Francisco at a rate of
$2,253.33 per month, and had resided for at least three years at
a rental in Vallejo, California, at monthly rent of $1,050.

Seizing upon the differences between income and rent as
stated in the 2015 credit application and in the 2017 bankruptcy

---

[9]Complaint, ¶ 20 ([insurer denied  coverage because] "her
boyfriend was driving the vehicle at the time it was in an
accident and was totaled.  Plaintiff suspects the Debtor
purchased the vehicle for her boyfriend and his use....").

1  filing, BMW Bank commenced this action.

2

3                           Procedure

4      The adversary proceeding was filed April 5, 2017, seeking a
5  money judgment for the full unpaid contract amount of $46,041.96
6  to be excepted from discharge under §§ 523(a)(2)(A) and (B).

7      Default was entered when the debtor did not respond, after
8  which BMW Bank requested default judgment for the full contract
9  price and an exception to discharge on a theory of fraud.

10     BMW Bank has abandoned its generic fraud theory under
11  § 523(a)(2)(A) and elected to rely on a false financial statement
12  theory under § 523(a)(2)(B).

13     This court proceeded with the required independent review
14  under Civil Rule 55(b)(2) to determine for itself whether the
15  requested default judgment is warranted in law and fact.  Fed. R.
16  Civ. P. 55(b)(2), incorporated by Fed. R. Bankr. P. 7055.

17     Incredulous about BMW Bank's allegation that it was gulled
18  into the transaction by debtor's statements about her finances,
19  this court required BMW Bank to prove entitlement to the relief
20  requested.  After three hearings in which BMW Bank relied on
21  various forms of written declarations, there was an evidentiary
22  hearing at which its witness testified.  Further supplemental
23  briefing followed the evidentiary hearing.

24     When this court announced orally on the record that it was
25  not yet persuaded to enter default judgment and offered BMW Bank
26  yet another opportunity to prove its case, BMW Bank stated its
27  wish to appeal without presenting further proof and requested
28  preparation of this formal decision denying the motion for

                                 7

default judgment and dismissing the adversary proceeding.

## Jurisdiction

Jurisdiction is founded on 28 U.S.C. § 1334(b). This is a core proceeding that a bankruptcy judge may hear and determine. 28 U.S.C. § 157(b)(2)(I). If it may ever be determined to be a proceeding that a bankruptcy judge may not hear and determine as of right, the plaintiff is nevertheless has agreed that it may be heard and determined by a bankruptcy judge.

## Analysis

A missing link affecting a causation issue is at the heart of the problem. BMW Bank omits all evidence regarding the role of the BMW dealer as intermediary in the financing transaction. Yet, it is inescapable that the BMW dealer manipulated the trade-in deal in a manner that created inquiry notice of the true facts. The 17-month history of timely payments on the 2013 BMW so blinded BMW Bank and the BMW dealer to the debtor's patent inability to pay that the credit application was treated as a mere formality upon which there was not actual reliance and belies the debtor's intent to deceive.

I

Default judgment procedure in bankruptcy courts is governed by Federal Rule of Civil Procedure 55(b), which applies in adversary proceedings and contested matters by virtue of Federal Rule of Bankruptcy Procedure 7055. Fed. R. Civ. P. 55(b), incorporated by Fed. R. Bankr. P. 7055 & 9014(c).

Under Rule 55(b), federal trial courts have an independent duty to exercise discretion and assure themselves that the default judgments they enter are correct in law and fact. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2685 (4th ed. 2019).

In discharge of that duty, a court may conduct hearings to establish the truth of any allegation by evidence. Fed. R. Civ. P. 55(b)(2)(C). In other words, a court need not uncritically accept a plaintiff's version of the facts. That occurred here.

## II

The matrix for analysis of plaintiff's theory of the case is § 523(a)(2)(B), which requires proof of a materially false statement regarding the debtor's financial condition on which the victim's reliance was "reasonable," not merely "justifiable." Lamar, Archer & Cofrin, LLP v. Appling, ___ U.S. ___, ___, 138 S.Ct. 1752, 1763 (2018).

Where there is a false statement concerning financial condition, § 523(a) provides:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt —...
>    (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ...
>       (B) use of a statement in writing —
>          (i) that is materially false;
>          (ii) respecting the debtor's or an insider's financial condition;
>          (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
>          (iv) that the debtor caused to be made or published with intent to deceive;

11 U.S.C. § 523(a)(2)(B) (emphasis supplied).

9

In contrast, where the fraud involves a false statement other than a false statement concerning financial condition, the reliance element is "justifiable" reliance other than "reasonable" reliance.  11 U.S.C. § 523(a)(2)(A); <u>Field v. Mans</u>, 516 U.S. 59, 77 (1995).[10]

As the Supreme Court explained in <u>Field v. Mans</u> and again in <u>Appling</u>, Congress endeavored to balance potential misuse of financial statements by debtors and by creditors in order to moderate the burden on individuals who submitted false financial statements, not because lies about financial condition are less blameworthy than others, but because the relative equities might be affected by practices of consumer finance companies, which sometimes have encouraged such falsity by their borrowers for the very purpose of insulating their own claims from discharge. <u>Appling</u>, 138 S.Ct. 1763-64; <u>Field v. Mans</u>, 516 U.S. at 76-77.[11]

---

[10]A nondischargeable "actual fraud" need not always involve a false representation.  <u>Husky Int'l Elecs., Inc. v. Ritz</u>, ___ U.S. ___, 136 S.Ct. 1581, 1589-91 (2016).

[11]The mischief lies in the practice described in the House Report on the Bankruptcy Reform Act of 1978:

> It is a frequent practice for consumer finance companies to take a list from each loan applicant of other loans or debts that the applicant has outstanding.  While the consumer finance companies use these statements in evaluating the credit risk, very often the statements are used as a basis for a false financial statement exception to discharge.  The forms that the applicant fills out often have too little space for a complete list of debts.  Frequently, a loan applicant is instructed by a loan officer to list only a few or only the most important of his debts.  Then, at the bottom of the form, the phrase "I have no other debts" is either printed on the form, or the applicant is instructed to write the phrase in his own handwriting.

H. R. Rep. No. 95-595, pp. 130-31, U.S. CODE CONG. & ADMIN. NEWS

10

1    This case smacks of a creditor strategy to obtain financial

2  statements that are designed more for the purpose of snaring the

3  borrower than for making a responsible business decision.

4    The BMW credit application form invited the inaccuracies

5  about which BMW Bank now complains.  The BMW dealer's personnel

6  plainly were complicit in preparing the document and in tailoring

7  the numbers to satisfy BMW Bank's financial ratios.

8    In addition, as noted in <u>Field v. Mans</u>, § 523(a)(2)(B) also

9  requires proof of causation, which concept overlaps with the

10  requirement of materiality.  516 U.S. at 78.

11

12                              III

13    The facts are assessed through the prism of § 523(a)(2)(B)

14  with a view to reasonable reliance, materiality, and causation.

15

16                               A

17    Weatherford BMW had an opportunity to sell a 2014 BMW for

18  $35,000 to an existing customer with a spotless 17-month record

19  of current payments on the 2013 BMW being traded in.

20    That 17-month history of timely payments imparted confidence

21  that the new loan would similarly be timely performed.

22    But there was a problem.  The customer's annual income from

23  her desk-clerk job, coupled with the fact that she was also

24  paying for a $24,465 Toyota, was not adequate to support a

25  $46,263.71 automobile loan.

26  _____

27  1978, pp. 5787, 6091 (1977) (footnote omitted), <u>quoted</u>, <u>Field v.</u>
    <u>Mans</u>, 516 U.S. at 77 n.13, and <u>Appling</u>, 138 S.Ct. at 1763-64.

28    It is noteworthy that Justice Scalia, who decried references
    to legislative history, did not do so in <u>Field v. Mans</u>.

The dealer's solution for meeting BMW Bank's financial ratio for lending had two parts. First, fudge her finances by ignoring its own rules by not providing the landlord information required to verify the improbable amount of $200/month rent in the San Francisco market, and accepting a financial statement that was otherwise incomplete, internally inconsistent and vague. In that typed statement (filled out on a computer), somebody interlineated an unsigned and uninitialed handwriting adding $1,400/month in Social Security income.

Second, having shoehorned all the monthly credit possible into the debtor's income and expenses by fudging numbers and still being unable to make payments that would fully amortize the loan in 60 months, the transaction added a balloon payment of $11,862.00 at month 61 to make the numbers "work" for purposes of the lending aglorithm.

It is apparent that this engineering must have occurred with connivance by the BMW dealer who knew the rules of the game. But BMW Bank provides zero evidence regarding events at the BMW dealership. Rather, BMW Bank treats the debtor as dealing directly, i.e. bilaterally, with BMW Bank at arm's length without any input by the BMW dealer. That defies credulity; the BMW dealer was at center stage, helping to craft a credit application that would meet lending criteria.

Since BMW Bank has the burden to prove the relevant circumstances, its complete omission of evidence regarding the dealer constitutes a failure of proof, even under the lenient standards of default judgments.

B

The first hurdle is the question whether BMW Bank really relied on the credit application – i.e., whether the alleged misstatement in the credit application was material.

The fact of reliance is a mixed question of law and fact in which facts predominate, thereby committing the primary decision to the trial court subject to appellate review for clear error. See U.S. Bank, N.A., Tr. v. Village at Lakeridge, LLC, ___ U.S. ___, 138 S.Ct. 960, 966-67 (2018).

BMW Bank claims that it based its lending decision solely on the nominal financial ratio reported in the credit application as prepared with the assistance of the BMW dealer.

BMW Bank admits that it also obtained an Experian credit report.[12] Although it proffers a declaration asserting that the credit report actually was scrutinized, no sentient banker could have construed the credit report as supporting the accuracy of the credit application.

And, BMW Bank admits it ignored the corollary to the fact that the transaction needed an $11,862.00 balloon payment at month 61 in order to make the deal "work":  absent a prospect for the debtor's finances to improve, no sentient banker would have believed she probably will be able to pay such a sum.

Regardless of whether it may be "justifiable" for an automobile financier to rely on statements in a credit application that are contradicted by a credit report, it is not "reasonable" to rely without at least making a searching inquiry.

_____

[12]Supplemental Decl. in Support of Motion for Entry of Default Judgment, ¶¶ 6-7 & 15-17.

13

There was no such inquiry in this case.

C

The next hurdle is reliance.  In order to be excepted from discharge under § 523(a)(2), the debt for the BMW vehicle must have been "obtained by" fraud.  11 U.S.C. § 523(a).

BMW Bank contends that the financial ratios of 60 percent debt to income and 35 percent payment to income derived from the credit application were what caused it to approve the loan.[13] That is not credible.

The credible explanation for this transaction is that the business decision was made because of the 17-month history of timely payments on the 2013 BMW that was being traded in.  The requirement that there be in the file a credit application showing the requisite financial ratios was treated by BMW Bank and the BMW dealer as a formality.  Window dressing is not fraud.

It does not follow from the mere presence in the file of an inaccurate credit application and a contradictory credit report that the debt was "obtained by" false financial statement fraud. BMW Bank's witness testified that anything below the required financial ratios would be "automatically denied."[14]

If the financial ratios computed from the credit application had genuinely been material to the loan decision, then there would have been scrutiny in light of the credit report and an effort to explain the apparent contradictions.  BMW Bank has

---

[13]Id., ¶¶ 10-11.

[14]Id., ¶ 11.

1  proffered no evidence to establish that the contradictory credit

2  application and credit report "caused" it to make the loan.

3        Nor has BMW Bank proffered evidence probative of intent to

4  deceive as required by § 523(a)(2)(B)(iv).  The circumstantial

5  evidence of the 17-month payment history on the 2013 BMW being

6  traded in is more probative of the dynamics of the lending

7  decision and is more consistent with lack of intent to deceive.

8        Indeed, the determinative factor, upon which BMW Bank

9  relied, was the existence of that 17-month payment history, not

10  statements in the credit application.

11

12                                   D

13        The next mystery is why BMW Bank quietly acquiesced in the

14  insurance company's decision to decline coverage for the damage

15  to the vehicle when it supposedly was totaled.

16        It merely says that the "vehicle was in an accident and was

17  deemed a total loss by the insurance carrier" and that the

18  insurer denied the claim because the debtor's boyfriend was

19  driving the vehicle.[15]

20        No evidence is presented regarding follow-up with the

21  insurance company.  Why did the insurer decline coverage to the

22  lienor?  What protest did BMW Bank make?  Why damages of $46K

23  when the purchase price was $35K, which means the insurance claim

24  for the value of the vehicle was probably less than $35K?

25

26

27  ────────────────

28        [15]Decl. in Support of Motion for Entry of Default Judgment,
   ¶ 18.

E

Proximate causation for BMW Bank's loss also must be established.  The established pattern of nineteen consecutive timely payments on the two BMW vehicles in question is probative of cause.[16]  The primary reason the financing by BMW Bank of the second vehicle occurred was the record of timely payments.

BMW Bank's theory is that the debtor was acting as straw buyer for her boyfriend.[17]  That theory is difficult to gainsay. But it also suggests that the actual cause of the loss was something other than a false financial statement.  The pattern of satisfactory timely payments, including for the first two months after the transaction, suggests that the payments would have continued for the full contract period if only the vehicle had not been destroyed in an accident more than two months after the credit transaction in question.

The accidental destruction of the vehicle is an intervening unanticipated cause.  BMW Bank has not carried its burden to establish what loss, if any, was proximately caused by the putative false financial statement.

Conclusion

BMW Bank alleges that it was deceived into making the original loan because the credit application in its file had been

---

[16]As two prongs of § 523(a)(2) implicate the tort of intentional misrepresentation, proximate cause is a relevant concept.  See Grogan v. Garner, 498 U.S. 279, 283-90 (1991).

[17]Id., ¶ 19 ("Because the Debtor discloses ownership of two other Toyota vehicles in her schedules despite having no claimed dependents, BMW suspects that the Debtor may have purchased the vehicle for her boyfriend who regularly drove it.").

1 manipulated to show a required financial ratio.

2      The evidence supports the inference that the business

3 decision to make the loan was based primarily on the 17-month

4 history of payment on the BMW being traded-in.

5      BMW Bank disclaims any responsibility to compare the credit

6 report with the incomplete and facially improperly-prepared

7 credit application.  It makes no effort to account for the role

8 of the BMW dealer in the transaction, which, at a minimum,

9 included willful ignorance.

10      As to the amount of the loss, BMW Bank does not explain why

11 it passively accepted the denial by the insurer of coverage for

12 the collision damage to the vehicle.  Nor does it establish

13 proximate cause or otherwise explain why the proper measure of

14 damage should be $46,263.71 for a vehicle purchased for

15 $35,079.65 and wrecked after two timely payments were made.

16      All of these are matters as to which BMW Bank has not

17 carried its burden of proof despite having been afforded multiple

18 opportunities by the court to do so.

19      The motion for entry of default judgment will be denied.  In

20 view of BMW Bank's expressed desire to have final judgment so

21 that it may have an opportunity to appeal, the denial is with

22 prejudice and the adversary proceeding will be dismissed.

23

24 December 18, 2019

25                              _____
                                United States Bankruptcy Judge
26

27

28

1

**INSTRUCTIONS TO CLERK OF COURT**
**SERVICE LIST**

2

3          The Clerk of Court is instructed to send the attached
document, via the BNC, to the following parties:

4     Timothy J. Silverman
      Scheer Law Group, LLP
5     85 Argonaut, Suite 202
      Aliso Viejo, CA 92656

6
      Alisica Bonita Davis-Brown
7     1944 Sutter Street
      Vallejo, CA 94590

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28